IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEO NOGA,

        Plaintiff,

    v.                                     CIVIL ACTION
                                              NO. 18-3455

RELIANCE STANDARD LIFE INSURANCE
COMPANY,

        Defendant.

## MEMORANDUM OPINION

**Schmehl, J.  /s/ JLS**                              **August 27, 2019**

      Plaintiff, Leo Noga ("Noga"), brings the instant action to challenge the denial of his claim for disability benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) against Reliance Standard Life Insurance Company ("Reliance"), the insurance company that funded and administered the disability insurance plan provided by his employer, Fulton Financial. Noga claims that Reliance's denial of his claim for long term disability benefits was arbitrary and capricious.

      The parties have each moved for summary judgment. Noga argues that the record supports a finding of disability and therefore, Reliance's determination that he is not entitled to a long term disability benefits was incorrect. Reliance maintains that its decision to deny benefits to Noga was not arbitrary and capricious but was based on substantial evidence contained in the record that Noga was not entitled to long term disability benefits. After a thorough examination of the administrative record, I find that

Reliance acted in an arbitrary and capricious manner when it denied Noga's disability benefits. Therefore, I will grant Noga's motion for summary judgment and deny Reliance's motion for summary judgment.

## I.     BACKGROUND

Reliance issued group long term disability policy number LTD120852 to Fulton Finance Corporation. (Administrative Record 1-33) ("AR.") While Noga was employed full-time by Fulton, he was insured under this policy. (AR 329-332.) The policy grants Reliance the discretion to determine benefit eligibility and requires Noga to submit satisfactory proof of total disability. (AR 16, 20.)  The policy defines total disability to mean "that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her Regular Occupation." (AR 12.) The policy defines Regular Occupation to mean:

> the occupation the Insured is routinely performing when Total Disability begins. We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale.

(AR 12.) Noga's job with Fulton required him to drive to client meetings. (AR 360-61.) Noga's occupation involves "mostly sitting, may involve standing or walking for brief periods of time." (AR 363.) When asked by Reliance "[w]hat part of your occupation can't you do?" Noga responded "cannot drive to work, can't stand, walking limited." (AR 200.)

 Reliance admits that Noga worked in a sedentary occupation, and that his job description included the requirement that he "[m]ust be able to drive to outside locations to initiate and continue sales calling effort." (AR 360-361.) Noga stopped working for Fulton effective February 27, 2015, and subsequently applied for benefits under the

policy. (AR 333-341.) Everett Hills, M.D., completed the attending physician section of the disability application and identified neurogenic muscular atrophy as Noga's primary diagnosis and diabetes, hypothyroidism and hypertension as secondary conditions. (AR 342-343.) Noga's symptoms were identified as "leg weakness." (AR 342.)

Reliance accepted Noga's claim for long term disability benefits on August 20, 2015. (AR 242-244.) Reliance paid disability benefits in the amount of $4299.61 less Noga's Social Security benefits effective August 25, 2015, until December 27, 2017, when his benefits were terminated. (AR 203, 299-304.)

> At the time Reliance decided that Noga was entitled to benefits effective August 25, 2015, it had Noga's medical records reviewed by in-house medical personnel, Nurse Finnegan. (AR 125.) Nurse Finnegan determined: "Based on medical provided claimant with ongoing complaints of lower extremity weakness, EMG positive for right upper ulnar nerve involvement (although no complaints associated with upper extremity). Records do not support any cognitive deficits however claimant has been referred to psych. Based on medicals claimant lacks consistent work function and precluded from stand and walk on greater than an occasional basis. Claimant with hx of depression, Etiology of complaints and symptoms remain unknown, suspect a psychiatric contribution. Recommend obtaining medicals from PCP, Neurologist, Psychiatrist to assess claimants status beyond 10/1/15."

(AR 125.) On August 18, 2015, Reliance management reviewed this matter and stated: "Agree with recommendation to approve claim at this time under the policy 24 month M&N limitation [Mental & Nervous] (update plan duration) and continue to follow up for copies of ongoing medical work up results, including psych assessment." (AR 186.)

Reliance sent an approval letter to Noga that stated: "The policy refers to this as your maximum benefits period. Based on the group policy, benefits are payable for a period of 24 months if a disability occurs as a result of a mental or nervous disorder." (AR 243.)

On January 26, 2016, Reliance approved the claim for waiver of premium on the life insurance Fulton provided for Noga. (WOP 52-53.) The amount of this life insurance was $172,000. (WOP 52-53.)

Reliance continued to monitor Noga's condition and on August 15, 2017, his file was referred to a member of Reliance's medical staff. The file was reviewed by Leslie Moore, a registered nurse employed by Reliance. Nurse Moore stated as follows:

> Based on the medical records, there was prior mention of chronic pain and right wrist and ulnar neuropathy, and polyneuropathy; however, there is no mention of ongoing wrist neuropathy, pain or swelling. Claimant reports pain is 7/10 but is unclear where. Based on the complaint of chronic pain, claimant lacks work function; however, to better assess pain, would suggest obtaining pharmacy records to determine what medications claimant has filled, and who is prescribing them, and returning for review with medical records from all actively treating providers.

(AR 130.) Based on Nurse Moore's suggestion, Reliance requested additional records, which were received on August 18, 2017, and September 11, 2017. (AR 195.)

On September 18, 2017, Reliance's in-house nurse, Nurse Vicho, reviewed Noga's medical records and found:

> Based on the review of medical records provided, claimant is precluded from engaging in any sustained work function on a frequent and consistent basis ongoing due to persistent diabetic neuropathy on lower legs along with continued painful left shoulder following rotator cuff repair. Co-morbid with chronic fatigue, poor endurance and obesity. Consider updating records in about 5-6 months including serial narratives from Orthopedic, Surgery, Endocrinology and PCP along with diagnostic studies and laboratory studies for further file direction.

(AR 131.)

On October 10, 2017, Nurse Moore requested an independent medical examination through MES. (AR 1168-1171.) MES hired Dr. John Kline to conduct the examination, and Dr. Kline examined Noga on November 28, 2017. (AR 1185.) Dr.

Kline confirmed the diagnoses of diabetic peripheral neuropathy, hypothyroidism, gastroesophageal reflux disorder, erectile dysfunction with penile implantation, prior history of right lower extremity trauma for which Noga underwent multiple surgical interventions. (AR 1191.) Noga informed Dr. Kline that he stopped working due to diabetic peripheral neuropathy and reported significant lower limb pain and weakness. (AR 1185-1186.) Noga told Dr. Kline that he sleeps 2-3 hours during the day and would fall asleep while driving. (AR 1186.) Noga stated that he wore braces on his legs for about a year but that at the time of the examination, only required them intermittently. (AR 1186.) Noga "keeps a cane in his car in case he was to need it," but did not require an assistive device during the examination. (AR 1187, 1189.)

Dr. Kline inquired as to Noga's subjective tolerance levels and reported that Noga "does not demonstrate any difficulty sitting. He states the length of time he is able to stand and ambulate varies, depending on how he feels that day." (AR 1186.) Noga told Dr. Kline that he "smokes only medicinal marijuana as well as chews THC gummies. He does admit to alcohol utilization, which he states he drinks perhaps two Manhattans in a day and switches to wine in the evening hours." (AR 1187.)

During the examination, Noga exhibited "full, complete, and normoactive range of motion of the cervical spine, both shoulders, elbows, wrists metacarpal phalangeal, and interphalangeal joints." (AR 1189.) He also had "full, complete, and normoactive range of motion of the lumbosacral spine, both knees, and ankles. He did demonstrate some mild range of motion of both hips, exhibiting some mildly limited internal and external rotation bilaterally." (AR 1189.) Dr. Kline tested Noga's muscle strength and noted "normal 5/5 strength" in his upper and lower extremities. (AR 1190.) Dr. Kline found

that Noga's "prognosis for recovery in sensory impairment is poor. The sensory impairment that Mr. Noga currently has is permanent in nature and over time will either remain static or progress." (AR 1192.) Based on Noga's diagnoses, Dr. Kline expected self-reported complaints such as numbness, tingling and neuropathic pain; however, Dr. Kline also concluded that Noga "demonstrate[d] a high degree of symptom exaggeration or inappropriate pain behavior." (AR 1191-92.) Dr. Kline concluded that Noga:

> . . . would be capable of gainful employment. He would be capable of performing work within a light modified capacity, lifting or carrying up to maximum of 20 pounds. He would warrant no restriction on sitting. His walking would be limited to 10-15 minute intervals, with his standing limited to 20-30 minutes, without the utilization of any assistive devices. This may improve to some extent with his braces as well as utilization of a single point cane, which he did not bring to today's evaluation.
>
> Mr. Noga does not demonstrate any cognitive deficits. Mr. Noga's production rate in performing activities that require standing and walking on a regular basis clearly would be impaired, though his rate of productivity at a seated position would not be altered. Mr. Noga would not warrant any restriction on utilizing either of his upper extremities for fine manipulation, reaching, grasping, or repetitive upper extremity activities. He would not be restricted from reaching at a desk level, above mid chest or below, fingering or feeling with tactile sensation in either upper extremity, and he voices no complaint within his hands and has no significant deficit on clinical evaluation. A physical capabilities form has been provided to me, which I have completed in its entirety.
>
> Mr. Noga indicated that he is currently driving. If his proprioception once again should become substantially worse, Mr. Noga may benefit from hand controls to assist with his driving, as he does not demonstrate any upper extremity deficits.

(AR 1192-1193.)

After Dr. Kline's IME, and pursuant to a letter dated December 21, 2017, Reliance notified Noga of its decision to terminate benefits effective December 27, 2017. (AR 299-304.) On December 22, 2017, Reliance terminated the wavier of premium on Noga's life insurance (WOP 58-60.) Noga appealed from the termination decision on

January 2, 2018, and submitted additional records to Reliance for consideration. (AR 1200-1204, 1213-1218, 1262-1263, 1349-1356.)

On January 22, 2018, Noga was evaluated by his family practitioner, Glen Daughtry, D.O. for his "annual Medicare wellness visit and chronic problem checkup." (AR 1251-1256.) Dr. Daughtry also documented Noga's complaints of decreased feeling in both feet. (AR 1251.) As part of the examination, Dr. Daughtry responded to questions regarding Noga's "functional ability and safety" and responded "no" when asked "[b]ased on observation in the office, does patient appear to be unsteady?" (AR 1254.) When asked "do you need help with the phone, transportation, shopping, preparing meals, housework, medications, or managing money," Noga responded "yes." (AR 1254.)

On February 19, 2018, Noga returned to Neyha Cherin, D.O. for an annual follow-up and to obtain a disability letter. (AR 1267-1281.) Noga had last seen Dr. Cherin a year earlier, on March 28, 2017. Dr. Cherin wrote:

> Mr. Noga notes continued issues with feet, peripheral neuropathy. States his feet feel like a block of ice and he has difficulty mobilizing due to this. He uses a quad cane for long distances and he has had AFO's made for both of his feet. He is unable to drive long distances as he cannot feel the pedals. He also notes now due to all these issues he is getting panic attacks. He does exercise 5 days a week. He walks in the pool, 0.75 miles at a time. He notes the pool has helped get his legs stronger. He still uses a noodle to assist him in the deem (sic) end of the pools. He would like to build up to a mile hopefully in the near future.
>
> ***
> He reports his diabetes has been stable.
>
> ***
> Today he[] reports pain in his feet, and numbness in both feet. His health concerns are walking and pain. No other changes in medications. No further/additional trauma.

(AR 1267-1268.) Dr. Cherin provided Noga the requested disability letter and recorded the treatment plan as follows: "continue aquatic activities and fitness on daily basis," "continue weight management" and "return to clinic in 1 year with Dr. Hills." (AR 1270.)

By letter dated February 21, 2018, Jonathan Diamond, M.D. advised Reliance of Noga's "progressive renal insufficiency" and classified Noga as "stage 4." (AR 1564.) In a letter to Dr. Daughtry on that same date, Dr. Diamond wrote:

> He has no uremic issues. On exam his blood pressure is 128/80. Pulse is 80. He weighs 242 pounds. His renal ultrasound shows two kidneys of normal size, echotexture and cortical thickness. Head and neck are normal. Lungs are clear. Heart tones are normal. No gallop or rub. No edema. He is awake, alert and oriented without any asterixis or myocionus.

(AR 1239-1240.)

Dr. Daughtry saw Noga again on March 6, 2018, and reported his complaints as "bilateral neuropathy of legs, but they have been improving over the last 6 weeks. Has been walking without leg braces since then. He accentuates his walking picking up his legs higher than usual due to the weakness. He uses a cane frequently to walk and stability." (AR 1293.) Dr. Daughtry also reported his examination findings as follows:

> Well-developed, well nourished, male patient awake, alert, coherent and calm, comfortable. Neck: supple. No carotid bruits. No lymph nodes. Breathing well with no shortness of breath. Lungs: CTA without rales, wheezing. No significant anxiety symptoms was (sic) noted on exam. I. Heart regular in sinus rhythm without murmurs, rubs or gallops. ABD: Globus soft, nontender. Normal bowel sounds. Has bilateral ankle braces. No edema. Able to walk adequately. Weakness bilaterally with dorsiflexion, plantar flexion, abduction and adduction against resistance. No edema.

(AR 1294.) According to Dr. Daughtry, Noga's diabetes mellitus with neuropathy was stable and improving, chronic pain syndrome had good results with the use of

Gabapentin, autonomic neuropathy in diseases classified elsewhere were chronic but stable and stage 3 chronic kidney disease was moderate. (AR 1294-95.)

On March 19, 2018, after receipt of these additional medical records, Noga's file was again referred to Reliance's medical staff, and Patricia Toth, RN, was assigned to review the medical records. Nurse Toth concluded:

> Based on the medical records, lack of consistent work function at any level is supported ongoing. He has multiple symptoms related to neuropathy. There is an antalgic gait which is an ongoing barrier to safety. There are complications related to diabetes in the form of renal insufficiency and uncontrolled sugar level. Marked improvement is not anticipated. Life expectancy has likelihood of being less than full.

(AR 132.) Based on Nurse Toth's opinion, the claim manager, identified as "422jjx" (Jamil Jackson), made the following decision on March 22, 2018: "Decision to terminate benefits overturned and reinstated effective 12/27/17." (AR 144.) Then on March 23, 2018, one day later, Mr. Jackson contacted MES and requested two peer reviews on Noga's claim. (AR 141.)

On March 29, 2018, Dr. Hills, who last saw him on March 28, 2017, evaluated Noga. (AR 1350-1353.) Noga "returned to report that he needs a letter from this encounter to produce as a part of his permanent impairments and unemployability." (AR 1350.) Noga identified his problems as "walking, driving, kidneys, eyes and he specifically requests 'need a letter supporting disability.'" (AR 1350.) Dr. Hills wrote:

> In the interval time since Mr. Noga was last seen, he reports he sometimes uses a cane. He no longer wears ankle foot orthoses and has not since our last encounter on 03/28/17. He walks ½ - 1 mile in the pool on a daily basis 5 days a week at the Frederickson Center generally with his wife. He reports both he and his wife are retired. Mr. Noga reports no additional biopsies since the initial procedure in 2015.
>
> Mr. Noga describes today beginning with checking his blood sugar which the past 2 mornings have registered 206 and 208. He self injects his

Victoza injection. Mr. Noga assists his wife in the care of 2 grandchildren. Mr. Noga maintains a stable weight. He self-describes his condition as getting worse as he requires a daily nap. He feels uncomfortable when driving, which is confirmed by his mother. He also does not have the ability by his report to be in a work environment.

On review of systems, Mr. Noga reports that his feet continue to feel numb. He has episodes of panic attacks which constitute one reason he does not drive on certain roads such as interstate highways and the divided highways.

(AR 1350-1353.) Dr. Hills noted that "the purpose of today's visit was to provide Mr. Noga with an update yearly physical examination. More than half of this visit was for educational purposes. Mr. Noga is undergoing medical management for his diabetes and renal function." (AR 1352.)

Despite Nurse Toth's finding that Noga was disabled and Mr. Jackson's recommendation that his benefits should be reinstated, Reliance proceeded to obtain two independent peer review reports. (AR 1422-1430, 1501-1514, 1524-1525, 1357-1359.) Jillene Brathwaite, D.O., Board Certified in Internal Medicine with a sub specialty in endocrinology, diabetes and metabolism, reviewed all of Noga's medical records and issued a report on April 4, 2018. (AR 1422-1430, 1484-1485.) According to Dr. Brathwaite, as of December 2017, Noga had type 2 diabetes mellitus and hypothyroidism. (AR 1427.) She concluded that Noga's diabetes was well controlled with no indication of functional impairments but deferred the question of diabetic neuropathy and neurogenic muscular dystrophy to the appropriate specialty. (AR 1427-1428.) Dr. Brathwaite also stated that there is "no reported hypoglycemia that may affect one's ability to function well." (AR 1428.) On April 27, 2018, Dr. Brathwaite reviewed additional information and prepared an addendum to her previous report that stated "[b]ased on the claimant's reported fingersticks, his diabetes may not be as controlled as

it previously was but there is no mention of how this is affecting his ability to do his usual activities. In addition, an actual glucose log was not included with his current glucose readings." (AR 1524-1525.) Dr. Brathwaite concluded that "functional impairment it not supported" due to Noga's diabetes. (AR 1524.)

Siva Ayyar, M.D., also performed a peer review. Dr. Ayyar is Board Certified in Occupational Medicine and medical toxicology, and he reviewed Noga's medical records and issued a report on April 6, 2018. (AR 1501-1514, 1516-1519.) Dr. Ayyar stated that the "sole condition impacting the claimant's diagnosis is that of neurogenic muscular dystrophy/neurogenic muscular atrophy/peripheral neuropathy." (AR 1509.) Dr. Ayyar concluded as follows:

> The evidence on file . . . thus, does not support the proposition that the claimant's issues with lower extremity peripheral neuropathy and lower extremity neuromuscular dystrophy are so severe or so profound that they would result in the claimant's being rendered incapable of working. Rather, all evidence on file points to the claimant's ability to work on a full-time basis, at a minimum rate of 8 hours a day, 5 days a week, and/or 40 cumulative hours per week, within the parameters of the relatively permissive limitations enumerated below.

(AR 1510.) Dr. Ayyar received additional information and completed an addendum to his report. He stated:

> The new documentation did not alter my original opinion as set forth on my prior report dated April 6, 2018. Please see original report for rationale and opinion which is/are unchanged.
>
> If anything, the new information furnished by Dr. Hills reinforces and augments the original opinion as set forth on my prior report dated April 6, 2018. Additional information furnished by Dr. Hills reinforces the conclusion that the claimant's neurogenic muscular atrophy/muscular dystrophy has, in fact, improved over time and/or has responded favorably to the introduction of anti-neuropathic medications such as gabapentin. Commentary made by Dr. Hills on a letter dated March 29, 2018 to the effect that the claimant is only using a cane on an as-needed basis, "sometimes," is no longer wearing an ankle-foot orthosis and was capable

of walking and/or swimming 0.5 mile to 1 mile in the pool on a daily basis 5 days a week, taken together, strongly suggests that the claimant retains significant abilities, capabilities, and functionalities well in excess of his stated capacity and well in excess of his proclamation of inability to work.

The claimant's abilities, capabilities, and functionalities are thus best characterized through the limitations enumerated on my prior report dated April 6, 2018, which are reiterated below, for emphasis:

- Standing and walking are limited to no more than 15 minutes continuously, a maximum of 30 cumulative minutes an hour and a maximum of 4 cumulative hours per 8-hour day.
- Lifting, carrying, pushing, and/or pulling of articles are limited to those articles weighing 25 pounds or less for up to 3 cumulative hours per 8-hour day.
- Lifting, carrying, pushing, and/or pulling of articles weighing 26 pounds or more is collectively limited to rare and to more than 1 cumulative hour per 8-hour day.

The claimant should, for all of the limitations enumerated both above and on my prior report dated April 6, 2018, be considered capable of performing full-time work and/or non-work activities within the parameters of said limitations.

(AR 1357-1358.)

Thereafter, on May 18, 2018, Reliance concluded that its decision to terminate Noga's benefits was appropriate. (AR 310-317.) Noga then filed suit in the Court of Common Pleas of Lancaster County on June 19, 2018, and Reliance removed the matter to this Court on August 15, 2018. After a review of the entire administrative record, and for the reasons that follow, I find that Reliance acted arbitrarily in denying Noga's claim for LTD benefits.

## II.    LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. Proc. 56(c).  "A motion for summary judgment will not be defeated by 'the mere existence' of

some disputed facts, but will be denied when there is a genuine issue of material fact." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (*citing Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

The denial of benefits under an ERISA qualified plan is reviewed using a deferential standard. Where the plan administrator has discretion to decide whether benefits are payable, the exercise of its fiduciary discretion is judged by an arbitrary and capricious standard. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir.2011) (*citing Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)). Under this limited and deferential review, Reliance's adverse determination may not be reversed unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law."

*Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011), *quoting Abnathya v. Hoffmann-LaRoche, Inc.*, 2 F.3d 40, 41 (3d Cir. 1993).[1]

The court "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Abnathya v. Hoffmann La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir.1993), *abrogated on other grounds by Glenn*, 554 U.S. 105. While "the arbitrary and capricious standard is extremely deferential, it is not without some teeth. "Deferential review is not no review, and deference need not be abject." *Kuntz v. Aetna Inc.*, 2013 WL 2147945 (E.D.Pa. May 17, 2013) (internal quotations omitted). In addition, a court's review of factual determinations is limited to the administrative record that was before the administrator when it made the decision being reviewed. *Carney v. IBEW Local Union 98 Pension Fund,* 66 F. App'x 381, 385 (3d Cir.2003) (*quoting Mitchell v. Eastman Kodak Co.,* 113 F .3d 433, 440 (3d Cir.1997)). In evaluating the administrator's decision, a court must review two aspects: 1) "structural concerns regarding how the particular ERISA plan was funded," and 2) "various procedural factors underlying the administrator's decision-making process." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011).

The structural inquiry in an arbitrary and capricious review focuses on the financial incentives or conflicts of interest created by the plan's organization. In determining whether a plan administrator has abused its discretion in denying benefits, a court should consider the conflict of interest arising from the dual role of an entity that acts as both an ERISA plan administrator and a payer of plan benefits. *Glenn,* 554 U.S. at 112. In the instant matter, as in *Glenn*, the plan administrator is not the employer itself,

---

[1] Noga agrees that Reliance's denial of his LTD benefits should be subject to an arbitrary and capricious standard of review.  (See Pl's Brief in support of MSJ, pp. 7-8.)

but an insurance company. Accordingly, a conflict exists, and I must consider it in order to determine if the administrator has abused its discretion. *Glenn*, 544 U.S. at 115-116.

The procedural inquiry "focuses on how the administrator treated the particular claimant" and if irregularities in the review process cast doubt on the administrator's impartiality. *Miller*, 632 F.3d at 845. Examples of procedural anomalies that suggest arbitrariness include:

> reversing a decision to award benefits without new medical evidence to support the change in position, *id.* at 848; relying on the opinions of non-treating over treating physicians without reason, *Kosiba v. Merck & Co.,* 384 F.3d 58, 67–68 (3d Cir.2004); *Ricca v. Prudential Ins. Co. of Am.,* 2010 WL 3855254, at *7 (E.D.Pa. Sept.30, 2010); failing to follow a plan's notification provisions, *Lemaire v. Hartford Life & Acc. Ins. Co.,* 69 F. App'x 88, 92–93 (3d Cir.2003); failing to comply with the notice requirements of § 503 of ERISA by not giving specific reasons for the denial, *Miller,* 632 F.3d at 852; conducting self-serving paper reviews of medical files, *Post,* 501 F.3d at 166; failing to address all relevant diagnoses before terminating benefits, *Miller,* 632 F.3d at 853; relying on favorable parts while discarding unfavorable parts in a medical report, *Post,* 501 F.3d at 165; denying benefits based on inadequate information and lax investigatory procedures, *Porter v. Broadspire,* 492 F.Supp.2d 480, 485 (W.D.Pa.2007); ignoring the recommendations of an insurance company's own employees, *Post,* 501 F.3d at 165; imposing requirements extrinsic to the plan, *Miller,* 632 F.3d at 849; and, failing to consider the claimant's specific job requirements under an "own occupation" policy, *id.* at 855.

*Harper v. Aetna Life Ins. Co.*, 2011 WL 1196860, at *2 (E.D. Pa. Mar. 31, 2011).

## III.   DISCUSSION

Noga moves for summary judgment, claiming that Reliance's decision to deny his LTD benefits was arbitrary and capricious. Reliance argues that it is entitled to summary judgment because its claim determination was reasonable and supported by substantial evidence. For reasons set forth below, I will grant Noga's Motion for Summary Judgment and deny Reliance's Motion for Summary Judgment.

As stated previously, where an ERISA governed plan grants discretionary authority to the claims administrator to determine eligibility for benefits, as in this case, a court reviewing a benefits determination uses an "arbitrary and capricious" standard of review. *Firestone*, 489 U.S. at 115. In determining whether a benefits determination is arbitrary and capricious, the court must evaluate whether the determination was reasonable. *Abnathya*, 2 F.3d at 45. After a review of the administrative record, I find Reliance's benefits determination was not reasonable and therefore, was arbitrary and capricious.

Under the policy in question, Noga could receive benefits if he proved that he suffered from a "Total Disability," which means "that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her Regular Occupation." (AR 12.) The policy defines Regular Occupation to mean:

> the occupation the Insured is routinely performing when Total Disability begins. We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale.

(AR 12.) Therefore, in order to qualify for benefits, Noga was required to show that his disabilities prevented him from performing as a typical financial advisor. However, based on the record, Reliance's decision regarding Noga's disability claim was unreasonable.

First, as discussed above, a structural conflict exists because Reliance both funded and administered the award of disability benefits under the Policy. Accordingly, this structural conflict must be taken into consideration along with the procedural defects of the administrator's decision.

As to the procedural defects, I find that the administrator's decision was arbitrary and capricious because Reliance rejected the opinions of its own nurses and claims manager regarding Noga's disability and rejected the opinion of Noga's treating physician and its nurses without explaining the justification.

Numerous Reliance nurses found Noga to be disabled; Nurse Finnegan in July of 2015, Nurse Phillips in December of 2015, and Nurse Vicho in September of 2017. (AR 125, 128, 131.) Despite these opinions, Reliance opted to seek an independent medical evaluation from Dr. Kline, who opined on November 28, 2017, that Noga was not disabled. (AR 299-304.) Reliance then terminated Noga's benefits. (AR 1185-1195.)

On appeal, Nurse Toth, another Reliance employee, concluded that Noga had "lack of consistent work function at any level." (AR 132.) Jamil Jackson, the claims manager, then decided, based upon Nurse Toth's opinion, to overturn the termination of benefits and reinstate Noga's benefits effective December 27, 2017. (AR 144.) One day after Mr. Jackson's decision to reinstate benefits, someone from Reliance decided to request outside medical evidence in order to address whether Noga's benefits should be terminated or not. (AR 141.) Dr. Ayyar and Dr. Brathwaite then reviewed Noga's medical records only and opined that he was not disabled. (AR 310-317.)

Reliance produced an affidavit from Jamil Jackson that purports to explain why the decision was made to seek outside medical evidence a mere day after Nurse Toth found Noga to be disabled. However, I cannot consider this affidavit in deciding the cross-motions for summary judgment, as I may only consider the information that is contained in the administrative record. *Carney*, 66 F.App'x at 385. As this affidavit was not part of the administrative record, I cannot consider it, and there is no explanation in

the record for Reliance's decision to seek additional medical evidence a mere day after its own nurse found Noga to be disabled.

Multiple in-house nurses all found Noga to be disabled. A claims manager recommended reinstating Noga's benefits. Despite these opinions, Reliance then proceeded to send this matter out to two doctors for a paper review. The circumstances surrounding this decision are unclear. There is no evidence from which I can determine why Reliance sent the file out for additional review after initially finding that Noga's termination of benefits should be overturned. From the circumstances, I can only infer that Reliance was seeking an opinion that would allow them to overturn the decision to reinstate Noga's benefits. As Reliance has failed to follow the opinions and recommendations of its own nurses and claims manager by denying Noga's appeal, I find this to be a procedural conflict and evidence of an arbitrary and capricious claim decision. *See Post v. Hartford Ins. Co*., 501 F.3d 154, 165 (3d Cir. 2007).

Further evidence of a procedural conflict is the fact that Reliance made no attempt to explain why it rejected the opinion of Dr. Hills, Noga's treating physician, or its own nurses in either the termination letter or the appeal determination. (AR 299-304, 310-317.) As stated by my colleague Judge Sanchez in *Connelly*, "With regard to reports by personal physicians, while ERISA 'does not require that plan administrators give the opinions of treating physicians special weight, courts must still consider the circumstances that surround an administrator ordering a paper review [from a non-treating physician].'" *Connelly*, 2014 WL 2452217, at * 5. Dr. Hills, as well as several Reliance nurses, found Noga to be disabled. In its termination and appeal determination, Reliance provided no explanation as to why those opinions were rejected. This is further

evidence of arbitrary and capricious conduct. *See Kosiba v. Merck & Co.,* 384 F.3d 58, 67–68 (3d Cir.2004) (relying on the opinions of non-treating over treating physicians without reason suggests arbitrariness of decision).

Reliance can put forth no reliable evidence to support its decision to terminate Noga's benefits after several of its own employees found him to be disabled. The very circumstances surrounding Reliance's decision to ignore the opinion of its own nurse and claims manager and send Noga's file out for a paper review are suspicious enough to find the decision arbitrary and capricious. When that odd decision is taken into consideration along with the fact that Reliance failed to explain why it rejected the opinion of Noga's treating physician, another procedural defect, and in light of the structural conflict of interest, I find the administrator's decision to terminate Noga's benefits was arbitrary and capricious.

In its motion for summary judgment, Reliance argues that Noga failed to prove that he cannot perform the material duties of his occupation in the national economy, that he did not submit objective proof of his limitations, and that there is no evidence of disability due to diabetes or that Noga lacks the endurance to work. However, the administrative record contains no reliable evidence that Noga was able to return to work in December of 2017, and sufficient medical evidence exists to support Noga's claimed limitations.

In addition, Reliance did not terminate Noga's claim because he failed to provide objective proof of his limitations. (AR 299-304, 310-317.) To the contrary, Reliance terminated Noga's claim because it found that he could perform sedentary job activities. Reliance cannot now argue a different rationale for its termination of benefits, as that

would be a prohibited *post hoc* rationale. *See Schreibeis v. Retirement Plan for Employees of Duquesne Light Co*., 2005 WL 3447919, * 8-9 (W.D. Pa., Dec. 15, 2005.) Further, Reliance's own staff found that Noga was disabled and lacked the ability to work, and Reliance chose to ignore those opinions. As discussed above, this was arbitrary and capricious conduct, and Reliance cannot argue a lack of evidence when its own staff found such evidence existed.

Because Reliance's decision to terminate Noga's benefits was the result of an arbitrary and capricious decision, it is appropriate to retroactively award benefits and return Noga to the status quo that existed before the termination of his benefits. *See Miller,* 632 F.3d at 856–57 ("In the termination context ... a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully. Accordingly, benefits should be reinstated to restore the status quo."). I find as of December 27, 2017, the date his benefits were terminated, Noga was totally disabled.

Noga also seeks interest on the unpaid benefits. "[A]n ERISA plaintiff who prevails under § 502(a)(1)(B) in seeking an award of benefits may request prejudgment interest under that section as part of his or her benefits award." *Skretvedt v. E.I. DuPont De Nemours,* 372 F.3d 193, 208 (3d Cir.2004). This case does not present exceptional or unusual circumstances that would make an award of prejudgment interest inequitable, and therefore, Reliance must pay prejudgment interest as part of Noga's benefit award.

## IV.  <u>CONCLUSION</u>

Given the administrative record and applying a deferential standard of review, Reliance's decision to terminate Noga's benefits unreasonable and is therefore arbitrary

and capricious. There are no issues of fact, and summary judgment will be granted in

favor of Noga. Reliance's motion for summary judgment will be denied.